# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANTHONY P. NAVARRO, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 12 C 7535 |
| ) | |
| LANGDON D. NEAL, et al. ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are registered voters in Chicago and neighboring municipalities, and some of them want to run in the upcoming general election as Republican party candidates for positions in the Illinois General Assembly. They have sued the members of the Chicago Board of Election Commissioners, alleging violations of their First and Fourteenth Amendment rights. They contend that recently-adopted provisions in 10 ILCS 5/7-61 unduly restrict the candidates' access to the ballot. Defendants have moved to dismiss plaintiffs' suit. For the reasons stated below, the Court grants defendants' motion.

## Background

The Court accepts the allegations in plaintiffs' complaint as true for purposes of resolving the motions to dismiss. *See Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). The Court may also consider exhibits that plaintiffs have attached to their complaint. *See, e.g., Thompson v. Ill. Dept. of Prof.*

*Regulation*, 300 F.3d 750, 753 (7th Cir. 2005).

Under an Illinois statute, political parties that have received certain minimum amounts of support in previous elections choose their nominees for the general election through a primary election. 10 ILCS 5/7-2 & 5. In order for a candidate's name to appear on the ballot in a primary election, the candidate must file a petition for nomination. *Id.* § 5/7-10. Among other requirements, the petition must be signed by a sufficient number of "qualified primary electors." *Id.* "A qualified primary elector of a party may not sign petitions for or be a candidate in the primary of more than one party." *Id.* (internal quotation marks omitted); *see Rosenzweig v. Ill. State Bd. of Elections*, 409 Ill. App. 3d 176, 179–80, 946 N.E.2d 1113, 1116 (2011). A candidate seeking a party's nomination to run for election as a state senator must present at least 1,000 valid signatures. *Id.* § 5/8-8. A candidate seeking a party's nomination to run for election as a state representative must present 500 signatures. *Id.* All of the signatures must be collected within ninety days of the date the petition is due. *Id.* § 5/7-10. The winner of a party's primary is listed on the ballot for the general election.

There are two other ways for a party to place a nominee on the general election ballot. The first applies when someone wins the primary and becomes the party's nominee, but the nominee position then becomes vacant. An Illinois statute provides that a vacancy occurs when (among other things) the nominee dies or declines the nomination. *Id.* § 5/7-61. When such a vacancy occurs, the local officers of the political party, as defined by statute, may select a replacement nominee. *Id.*; *see id.* § 5/8-5 (defines political party officials who select replacement nominee). That nominee is not required to collect any signatures on nominating petitions.

2

Until recently, the same procedure applied when no one ran in the primary election to become the nominee, either on the ballot or as a write-in candidate. If that happened, party officials could then choose a nominee who would not be required to collect any signatures. In 2010, however, the General Assembly amended the statutory scheme. Now, when no one runs in the primary, party officials still select the nominee, but the nominee must also present a nominating petition with the same number of signatures as the nominee would have been required to present had she run in the primary. *Id.* The nominee, however, has only seventy-five days after the date of the primary to obtain these signatures.

Fourteen of the plaintiffs are registered voters living in the City of Chicago and neighboring suburbs (two of the plaintiffs, Connie Abels and Chris Cleveland, are not described in the complaint as living in Illinois or as registered voters). Five of the plaintiffs were appointed by local Republican party officials to run as the Republican nominee for seats in the state senate and state house of representatives after no one ran in the primary for the relevant districts. Plaintiffs allege that each of the five candidates submitted a nominating petition to the Illinois Board of Elections, although the affidavits plaintiffs have attached to their complaint state that the petitions were considered by the Chicago Board of Election Commissioners. Compl., Exs. A–E. In each case, the Board determined that the candidate had not submitted sufficient valid signatures from qualified primary electors as required by 10 ILCS 5/7-61. As a result, the candidate plaintiffs are not listed on the general election ballot as the Republican Party nominee for their respective seats in the Illinois General Assembly. The other plaintiffs are voters in various districts, including districts other than those in which the

candidate plaintiffs have attempted to run. The voter plaintiffs allege that they have been denied an opportunity to vote for a Republican nominee in the upcoming elections by the operation of section 5/7-61.

**Discussion**

A plaintiff "has stated a claim only if it has alleged enough facts to render the claim facially plausible, not just conceivable." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010). "When analyzing the sufficiency of a complaint, [the Court] construe[s] it in the light most favorable to the nonmoving party, accept[s] well-pleaded facts as true, and draw[s] all inferences in the nonmoving party's favor." *Id.*

Plaintiffs challenge the provisions of 10 ILCS 5/7-61 that require a party's nominee who is selected after no candidate ran in a primary to submit a petition for nomination with sufficient signatures. Plaintiffs contend that these provisions violate their rights to free speech and association under the First and Fourteenth Amendments. Defendants contend, among other arguments, that the Illinois statute does not violate the plaintiffs' rights and that plaintiffs' claims are barred by the doctrine of laches.

**A.     Laches**

The candidate plaintiffs were denied ballot access on July 13, 2012. Compl. ¶¶ 12–16. Yet they waited nearly ten weeks to bring this action, filing their complaint on September 20, 2012.

> Defendants contend that plaintiffs' claim is barred by the doctrine of laches.
>
> Laches arises when an unwarranted delay in bringing a suit or otherwise pressing a claim produces prejudice to the defendant. In the context of elections, this means that any claim against a state electoral procedure must be expressed expeditiously. As time passes, the state's interest in proceeding with the election increases in importance as resources are

4

committed and irrevocable decisions are made.

*Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citations omitted).

A candidate's claim is less credible when he has slept on his rights. *Id.* (finding that laches barred claim when plaintiffs waited eleven weeks after basis for their claims was a matter of public record and two weeks after they received actual notice); *see Williams v. Rhodes*, 393 U.S. 23, 35 (1968) (in a decision issued on October 15, refusing to order state to place party on the ballot for November election because of the difficulty of doing so at such a late date); *Nader v. Keith*, 385 F.3d 729, 736–37 (7th Cir. 2004) (ordering preliminary injunctive would be inequitable when candidate waited until June to file suit related to November election).

By waiting so long to bring this action, plaintiffs "created a situation in which any remedial order would throw the state's preparations for the election into turmoil." *Nader*, 385 F.3d at 736. Plaintiffs do not dispute defendants' contention that if the Court were to order the plaintiff candidates placed upon the ballot, the Chicago Board of Election Commissioners alone would incur additional printing costs of $100,000. Nor do plaintiffs dispute defendants' contention that other election authorities would be impacted by the order. Further, plaintiffs do not dispute that under Illinois law, the Board was already required to mail out absentee ballots. Thus were the Court to order the candidate plaintiffs to be placed on the general election ballot, the Board would have to print and mail replacement ballots to anyone and everyone who requested an absentee ballot. *See* 10 ILCS 5/16-5.01 (requiring mailing of absentees ballots forty-five days before election). Plaintiffs contend that $100,000 and the logistical difficulties associated with reprinting the ballots and mailing out new ones is not too high a price to pay to avoid

violation of their rights to free speech and association.  The question, however, is whether plaintiffs prejudiced defendants by not bringing their claim sooner.  On that score, the facts are clear.  Plaintiffs do not dispute that the costs the Board (and others) would be forced to incur would have been significantly lower had they brought this suit sooner, shortly after the candidate plaintiffs were denied ballot access.

Plaintiffs contend, however, that they could not have brought their suit sooner.  They contend that they needed time to realize that all of the plaintiffs were similarly affected by the challenged amendment to section 5/7-61.  Each plaintiff, however, has an individual claim that his or her rights were violated by the denial of ballot access.  There was no reason that any given plaintiff needed to know that others were in the same situation in order to file suit.  Moreover, the Seventh Circuit has held that a plaintiff might be expected to bring a suit even before he has been denied ballot access, if he is aware of a law that may prove to be an obstacle to his access to the ballot.  *Nader*, 385 F.3d at 736 (noting that candidate could have sued to challenge ballot access regulation when he declared his candidacy).  All of the candidate plaintiffs were aware of the ballot access restriction long before they were denied ballot access, because they actually made efforts to obtain sufficient signatures from qualified primary electors.  At the same time that they began that process, presumably shortly after Illinois's primary on March 20, 2012, any of them could have filed suit challenging the requirement that they obtain signatures.  10 ILCS 5/2A-1.1(a).

In sum, the plaintiffs, particularly the candidate plaintiffs, could have filed suit soon after ballot access was denied on July 13.  The fact that plaintiffs waited ten weeks after the denial of ballot access imposed considerable costs on the defendants that they

6

otherwise would not have faced. Plaintiffs' claims are thus barred by the doctrine of laches.

**B.     Constitutionality of ballot access restrictions**

Although the Court has concluded that plaintiffs' claim is barred by the doctrine of laches, it addresses the merits to ensure a complete record on appeal.

"Ballot access laws . . . place burdens on the rights of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms." *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (ellipses in original; internal quotation marks omitted). "These rights, however, are not absolute." *Libertarian Party v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997). "Accordingly, the mere fact that a State's system creates barriers tending to limit the field of candidates from which voters might choose does not of itself compel close scrutiny." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (ellipses in original; internal quotation marks omitted). "Instead, . . . a more flexible standard applies." *Id.* at 434.

> When reviewing a challenge to a state's election laws, a court must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule. . . . If the state subjects these rights to severe restrictions, the regulations must be narrowly drawn to advance a state interest of compelling importance. If the state imposes reasonable, nondiscriminatory restrictions on these rights, however, the state's important regulatory interests will generally be sufficient to justify the regulations.

*Libertarian Party*, 108 F.3d at 773 (citations, ellipses in original, and internal quotation marks omitted).

The Court concludes that requiring candidates to obtain a certain number of

7

signatures is not a severe restriction on candidates' and voters' rights to free speech and association. *Id.* at 775 (requirement to obtain signatures of five percent of voters is not severe by itself); *see Lubin v. Panish*, 415 U.S. 709, 718–19 (1974) (noting that signature requirements are more reasonable and less severe than filing fees); *Protect Marriage Ill. v. Orr*, 463 F.3d 604, 607 (7th Cir. 2006) (reasonable for state to require a candidate to "demonstrate significant support for his candidacy by submitting thousands . . . of petitions in order to prevent voter confusion that would be engendered by too long a ballot"). The amendment to 10 ILCS 5/7-61 requires only that candidates chosen by a party when there was no primary winner meet the same signature requirements as candidates who ran in the primary election in the first place. *Munro v. Socialist Workers Party*, 479 U.S. 189, 197–98 (1986) (suggesting that burden of running in open primary and burden of obtaining signatures are similar and that both are not severe); *Jenness v. Fortson*, 403 U.S. 431, 440 (1971) (burden of winning primary is greater than the burden of obtaining signatures to be listed on ballot). And candidates who run in the primary must, unlike the candidate plaintiffs, face the additional challenge of competing in the primary itself. The Court also notes that each of the candidate plaintiffs could have chosen to run as a candidate in a Republican Party primary, either as a write-in candidate or as a candidate who had acquired the necessary signatures in the ninety day period before the primary. *See Lubin*, 415 U.S. at 718 (discussing the importance of alternative methods of ballot access); *see also* 10 ILCS 5/7-5 (to qualify as a write-in candidate, candidate need not present signatures).

Plaintiffs contend that the new version of section 5/7-61 severely burdens their rights because they must collect the same number of signatures as candidates who

8

appeared on the primary election ballot, but in only seventy-five days instead of ninety. They also contend that the new statute is disadvantageous to them because candidates on the primary ballot collect their signatures earlier when their opponents are doing the same, whereas candidates chosen by party officials after the primary must collect signatures during a period when their opponents are free to campaign for the general election.

Candidates like the plaintiffs, however, do not face the burden of competing in a primary election, nor do they have the burden of having to begin working sooner to collect the signatures before the primary. *See Storer v. Brown*, 415 U.S. 724, 733 (1974) (recognizing that the burden of collecting signatures is equivalent to burden of running in primary). Candidates collecting signatures after the primary may also have the support of the party in their attempt to gain ballot access, which is less likely to be the case for candidates seeking ballot access in a contested primary election. Seventy-five days to collect 500 or 1000 signatures is also not a severe burden in an absolute sense; the Supreme Court has held that requiring a candidate to collect 325,000 signatures in twenty-four days is not a severe burden, if there is a large enough pool of eligible signers to tap. *Id.* at 740.

Plaintiffs also contend that the new signature requirement improperly discriminates between candidates appointed by a party to fill a vacancy and candidates appointed when no candidate ran in the primary, although they do not expressly make a claim that the law violates their equal protection rights. The Court concludes that the legislature's choice to require signatures when there is no candidate who runs in the primary but not to require signatures when there is a candidate who wins the primary

and a vacancy later occurs is reasonable and not a violation of the plaintiffs' rights to free speech or free association. The vacancy provision can be invoked by parties as little as fifteen days before the general election and by its plain language is intended to cover unexpected occurrences, such as the death of a nominee. 10 ILCS 5/7-61. Under these circumstances, and particularly given that the statute only allows the party eight days after the vacancy occurs to choose a new nominee, *see id.*, a requirement that a candidate selected to fill a vacancy obtain signatures might well be considered overly burdensome. By contrast, in the case where no candidate ran in the primary, the party is aware even before the date of the primary that it will need to obtain signatures if it eventually nominates a candidate, giving it a great deal more time to prepare and then obtain the necessary signatures.

Having concluded that the restrictions imposed by 10 ILCS 5/7-61 are reasonable and not severe, the Court must determine whether the state offers an important regulatory interest. Defendants asserts that the state has an important interest in removing a loophole that previously allowed access to the general election ballot for candidates lacking any indication of public support. The Court agrees. "States . . . have a strong interest in preventing voter confusion by limiting ballot access to serious candidates who can demonstrate at least some level of political viability." *Lee*, 463 F.3d at 769. "Ballot access . . . . must be tightly regulated for the protection of the democratic process. . . . A state is not required to list everyone who wants to stand for office, for then ballots would be the size of telephone books." *Protect Marriage Ill.*, 463 F.3d at 607. "The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot,

because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates." *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983). "Moreover, as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer*, 415 U.S. at 730.

Plaintiffs assert that the record of the legislative debate regarding the amendment to section 5/7-61 did not include any facts or allegations stating that voters were confused or that ballots were unwieldy due to the number of candidates. The burden of offering a justification for ballot restrictions falls on the defendants in this case, however, not on the General Assembly when it enacted the amendment. *See Burdick*, 504 U.S. at 439–40 (considering justifications asserted by state in its briefs); *Libertarian Party*, 108 F.3d at 774 (considering justification for ballot access law offered by state board of elections at time of litigation). In addition, the Illinois Supreme Court determined from the plain language of the new section 5/7-61 that the state legislature intended to require a candidate to show "basic level, grassroots support." *Wisnasky-Bettorf v. Pierce*, 965 N.E.2d 1103, 1108 (Ill. 2012). Finally, the United States Supreme Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95.

The Court concludes that allowing ballot access only to candidates who have shown a significant level of public support is an important state interest. That interest is served by section 5/7-61, which requires all candidates, except for those nominated in the event of an unexpected vacancy, to demonstrate that sufficient eligible primary

electors support their candidacy.

Plaintiffs contend that section 5/7-61 makes it effectively impossible for any Republican candidate to gain ballot access in the districts in which they attempted to run.  They argue that these districts have not held Republican primaries for some time, so there are insufficient qualified primary electors of the Republican party to permit a Republican candidate to gain ballot access.  Plaintiffs do not, however, cite any provision of law that requires qualified primary electors to have voted in Republican primaries previously or to have been otherwise active in the Republican party.  Illinois statute imposes only one requirement on qualified primary electors who sign nominating petitions, specifically, that they may not sign nominating petitions for candidates of more than one party.  10 ILCS 5/7-10.  Beyond this, Illinois statutes do not limit who is a qualified primary elector.  Illinois courts have held that a qualified primary elector for a party need only be someone who could vote in a party's primary if one were held. *Cullerton v. Du Page Cnty. Officers Electoral Bd.*, 384 Ill. App. 3d 989, 996, 984 N.E.2d 774, 779 (2008).  A voter need not register for a particular party to vote in its primary, and in fact one can vote in a party's primary even if she voted in a different party's primary in previous election cycles.  10 ILCS 5/7-44; *Hossfeld v. Ill. State Bd. of Elections*, 238 Ill. 2d 418, 429, 939 N.E.2d 368, 374 (2010).  Thus, the only voters in a district who are *not* qualified primary electors able to sign a Republican candidate's petition are those who signed petitions for candidates of another party or who already voted in a different party's primary in the current election cycle.  The fact that the districts in which the plaintiff candidates sought to run have not had Republican primaries in the past is therefore irrelevant.

In addition, the candidate plaintiffs contend that they submitted sufficient signatures for ballot access but that they lacked sufficient valid signatures once the signatures of those who were not qualified to sign Republican petitions were removed. The decisions of the Chicago Board of Election Commissioners denying the five candidate plaintiffs ballot access do not reflect, however, that any of the signatures were deemed invalid because they were made by voters who had not previously voted in Republican primaries. *See* Compl., Exs. A–E.

In view of the fact that plaintiffs are not prevented from collecting valid signatures by the lack of prior Republican primaries in the relevant districts, their contention about their inability to collect enough valid signatures seems to be little more than an argument that they were denied ballot access because they lacked substantial support. As discussed above, Illinois has an important regulatory interest in limiting ballot access to candidates with substantial support in the electorate. *Lee*, 463 F.3d at 769; *see also Munro*, 479 U.S. at 197 (mere fact that few candidates qualify does not mean that ballot access restriction is severe).

In sum, the Court concludes that the challenged provision in 10 ILCS 5/7-61 does not impermissibly restrict plaintiffs' First and Fourteenth Amendment rights.

## Conclusion

For the reasons stated above, the Court grants defendants' motion to dismiss [docket no. 6]. The Court directs the Clerk to enter judgment in favor of the defendants.

_____
MATTHEW F. KENNELLY
Date: October 15, 2012                     United States District Judge